UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HARTFORD FIRE INSURANCE COMPANY,

        Plaintiff/Counter-Defendant,

    v.

AARON INDUSTRIES, INC.,

        Defendant/Counter-Claimant.

No. 18 CV 4123

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Hartford Fire Insurance Company insured some of defendant Aaron Industries Inc.'s machinery. While that machinery was being stored by a third party, someone sold it to a scrap metal company. Aaron filed a claim requesting reimbursement for the loss but Hartford denied coverage, saying the policy excluded losses sustained as the result of dishonest acts committed by anyone to whom covered property had been entrusted. Aaron pointed to an exception to the exclusion that applied if the act was committed by a "sales customer," but Hartford said the third party was not a sales customer and filed this declaratory action seeking a determination of its rights and obligations under the policies. Aaron counterclaimed for declaratory relief, breach of contract and bad faith, and both parties filed motions for summary judgment. Because that third party was a "rental or sales customer" under the policies, Aaron's motion is granted and Hartford's is in part denied. But because Hartford's denial was not vexatious or unreasonable, Hartford is entitled to judgment in its favor on Aaron's bad-faith claim.

## I.  Legal Standards

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must show that, after "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party," *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014), a "reasonable jury could not return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party is also entitled to summary judgment when the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). These same rules apply equally to cross-motions for summary judgment, *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017), and I may consider evidence from one motion when deciding the other. *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019).

In deciding a motion for summary judgment that calls for the interpretation and application of a contract in a declaratory judgment action, when the terms of the contract are "clear and unambiguous," the contract should be construed and applied according to its literal terms. *Elkhart Lake's Rd. Am., Inc. v. Chicago Historic Races, Ltd.*, 158 F.3d 970, 972 (7th Cir. 1998). Although insurers have the burden of proving that an exclusion applies, the insured has the burden "to prove that an exception to the exclusion applies." *Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d

339, 347 (7th Cir. 2010); *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 460 n.2 (7th Cir. 2019).

## II. Facts

Aaron is in the business of buying and selling new and used machinery. [44] ¶ 3; [36-1] at 8:20–9:5.[1] Hartford issued Aaron an insurance policy that covered "direct physical 'loss'" to some of their machinery. [47] ¶¶ 5–6; [1-1] at 136. That policy contains an exclusion for any loss "caused directly or indirectly by or resulting from any … [e.] Dishonest or criminal acts, including conversion and theft" committed by, among others, "[a]nyone, other than a carrier for hire or rental or sales customer, to whom [Aaron] release[s] or entrust[s]" any of the covered property, "including their employees, for any purpose." [44] ¶ 6; [47] ¶ 7; [1-1] at 138–39. The exclusion applies whether or not such persons "are acting alone or in collusion with others," *id.*, but does not apply to "acts of conversion and theft committed by [Aaron's] rental or sales customers or carrier(s) for hire." *Id.*

As part of a joint venture with Reich Brothers Equipment LLC, Aaron bought thirteen barges, each of which contained six stainless steel tanks (seventy-eight tanks

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Hartford's response to Aaron's Local Rule 56.1 statement, [44], and Aaron's response to Hartford's Local Rule 56.1 statement, [47], where both the asserted fact and the opposing party's response are set forth in one document. When the parties raised arguments in their statements of fact or failed to cite to supporting material in the record, I disregarded those portions of their statements, motions, and responses. *See* Local Rule 56.1; *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) ("[i]t is inappropriate to make legal arguments in a Rule 56.1 statement of facts").

in all). [44] ¶ 7; [47] ¶ 9; [36-2] at 9. Aaron's vice president of sales, Michael Cohen, then retained a one-man brokering operation (Joseph Garza of JNG Enterprise Inc., [44] ¶ 8; [47] ¶ 12) who eventually participated in discussions involving Aaron, Reich, Ryan Cheramie, and Ocean Marine Contractors. [44] ¶ 9; [47] ¶ 13. In an email, Garza said that Cheramie was the "COO" of Ocean Marine Contractors. [36-3] at 1. Cohen says that he does not remember Cheramie's title, but that Cheramie was one of two contacts that one of Cohen's associates had at Ocean Marine Contractors. [36-1] at 42:16–43:7. Cohen received an insurance certificate that showed that Ocean Marine Contractors was insured under the same policy as Ocean Marine Recycling LLC and a number of other entities with similar names, such as Ocean Marine Contractors (Scrap Division) LLC and Cheramie Commercial Rentals LLC. [36-1] at 44:2–24; [36-4].

Aaron, Reich, and JNG eventually entered into an agreement. *See* [44] ¶¶ 12–13; [47] ¶¶ 17–18; [36-6]. According to that agreement, Aaron and Reich would loan $75,000 to JNG and, in return, JNG would provide logistics for transporting the barges to Ocean Marine Contractors's facility in Louisiana. [36-6] at 1. Once the barges had arrived, Ocean Marine Contractors would remove the tanks and store them for five years. *Id*. In return, Ocean Marine Contractors would be allowed to dismantle and retain ownership of the barges that had carried the tanks to their facility. *Id*. *See also* [44] ¶¶ 12, 13; [47] ¶ 18. No one from Ocean Marine Contractors signed the agreement. [36-6].

4

Shortly after that agreement was signed,[2] the barges and tanks made their way down the Mississippi River to Louisiana. [44] ¶ 13; [47] ¶ 19. Aaron and Hartford agree that by that point, Aaron had entrusted the tanks to Ocean Marine Contractors. [44] ¶ 11. In May and June of 2016, Aaron and Reich sent employees to the facility to inspect the tanks. [47] ¶ 20. No problems were reported. *Id.* The tanks were completely removed from the barges by that August, [47] ¶ 21, and in December of 2016, while Aaron and Reich were actively trying to sell the tanks, Cheramie made an offer on behalf of Ocean Marine Recycling LLC to buy all seventy-eight tanks for $978,120. [47] ¶ 22; [36-8]. Aaron and Reich rejected the offer. [47] ¶ 22.

Unbeknownst to Aaron, the vast majority of the tanks were subsequently dismantled and sold during the time they were supposed to be safely stored at Ocean Marine Contractors's facility. [44] ¶ 14.

In March of 2018, Aaron and Reich filed suit in Louisiana against Ocean Marine Contractors, Ocean Marine Recycling, JNG and others, alleging that they had illegally misappropriated sixty-six of the seventy-eight tanks. [47] ¶¶ 28–30. In those pleadings, Aaron alleges that Cheramie directed the dismantling and sale of the tanks, [36-7] ¶ 35, and that the funds obtained from the sale of the scrap metal went to Ocean Marine Recycling and Cheramie personally. *Id.* ¶ 41. One of Cheramie's filings in that action largely confirmed that version of the events, [39-7] at 2, and

---

[2] The agreement is dated April 20, 2016, [36-6], and Aaron's response to Hartford's Rule 56.1 statement says that the barges were released for transport "[s]hortly after executing the agreement" but, somehow, towed (for more than a year) between April 29, 2000, and May 1, 2001. [47] ¶ 19. These dates are undisputed, but given that Aaron and Reich did not purchase the barges until 2015, [36-2] at 1, I find that the barges were transferred in 2016.

attached a sworn declaration from Cheramie. *Id*. at 12–15. In that declaration, Cheramie says he is an authorized and duly appointed representative of both Ocean Marine Contractors and Ocean Marine Recycling, that Ocean Marine Recycling purchased all of the barges (and the tanks) from JNG in April of 2016, that Cheramie thereafter directed a scrap metal buyer to scrap the tanks, that Cheramie had the buyer make their check out to Cheramie's personal account because Cheramie's bank was the only bank that would accept the buyer's checks, and that after depositing the money he quickly transferred it back to Ocean Marine Recycling's account. [39-7] at 12 ¶¶ 2, 8–9, 11–15.

Aaron notified Hartford of the loss at around the same time it filed suit in Louisiana, [44] ¶ 17, and Hartford denied coverage a few months later. [44] ¶ 18. Hartford acknowledged receipt of documents showing that Cheramie and Ocean Marine Recycling received money for scrap metal that was sold during the fall and winter of 2017–2018, [39-4] at 1, and Hartford noted that during an inspection a "crew member told the Aaron employee that Ryan Cheramie instructed them to cut up the tanks to sell for scrap." [39-4] at 2. Hartford asserted that, although Ocean Marine Recycling's "work crews may have dismantled the tanks," and although Ocean Marine Recycling "may have received the funds from the sale of the scrap," all of that had been "done at the direction of Ryan Cheramie, to whom Aaron had entrusted the property." [39-4] at 3. Hartford denied coverage because "the conversion and theft of the tanks [was] a dishonest or criminal act committed by someone to whom Aaron entrusted the property." *Id*. at 3. Hartford reasoned that Cheramie's offer to purchase

6

the tanks was not enough to make him a sales customer and that any relationship that existed between Aaron, Cheramie, Ocean Marine Contractors, and Ocean Marine Recycling was "that of a bailee, not a sales customer." [39-4] at 3.

Hartford never determined on whose behalf Cheramie was acting when he allegedly directed the dismantling of the tanks. *See* [39-4]; [39-10] at 95:20–102:3. Hartford initially made little or no effort to determine whether Cheramie was acting on behalf of Ocean Marine Contractors, himself, or some other entity when he dismantled the tanks, but Hartford's position was that it did not matter which person or entity committed the act; acts committed by any of them of them would have fallen under the exclusion. *Id.* After someone brought up the sales-customer exception to the exclusion, Hartford asked for more documents, received those documents, reviewed them, and decided that it had enough proof that the exclusionary clause applied. *Id.* at 102:17–103:4.

Hartford then initiated this lawsuit, seeking declaratory relief. [1] at 5.[3] Aaron counterclaimed, alleging breach of contract, bad faith in violation of Illinois law, 215 Ill. Comp. Stat. 5/155, and, in the alternative, declaratory relief. [10] at 11–14. Hartford moves for summary judgment on its declaratory relief claim, [35] at 1, and Aaron's bad faith claim. *Id.*; [36] at 7. Aaron moves for summary judgment on

---

[3] Hartford is a Connecticut corporation with its principal place of business in Connecticut, [47] ¶ 1, and Aaron is an Illinois corporation with its principal place of business in Illinois. [47] ¶ 2. The machinery in question is valued at more than $75,000 (Aaron and Reich bought it for more than $1 million, [36-2] at 1), and the parties have placed that amount in controversy by seeking a declaratory judgment that, if obtained, would require the other to foot the bill. I have jurisdiction under 28 U.S.C. § 1332(a).

Hartford's declaratory relief claim and for partial summary judgment on Aaron's counterclaim on the issue of liability. [38] at 3.

## III. Analysis

Illinois law applies to the interpretation of the policy. Parties can waive the choice of law issue by failing to assert it if they "submit to Illinois law and rely solely on it." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) (cleaned up); *Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009). Hartford argues that Illinois law should apply, [36] at 7–9, and Aaron advances exclusively Illinois law in support of its interpretation of the contract. *See* [39]; [46]. That is reason enough to hold the parties to Illinois's principles of contract interpretation. *See McCoy*, 760 at 684.

Under Illinois law, "a court initially looks to the language of a contract alone." *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462 (1999). Language in a contract is ambiguous if it is "susceptible to more than one meaning," *id.*, and whether a contract is ambiguous is a question of law. *RBS Citizens, Nat. Ass'n v. RTG-Oak Lawn, LLC*, 407 Ill.App.3d 183, 189 (1st Dist. 2011). Courts may only consider reasonable interpretations of contractual language, *Atwood v. St. Paul Fire & Marine Ins. Co.*, 363 Ill.App.3d 861, 863 (2nd Dist. 2006), and should give contractual terms their "plain, ordinary, and popular meaning." *Founders Insurance Co. v. Munoz*, 237 Ill.2d 424, 436 (2010) ("i.e., we look to [their] dictionary definition"). Provisions that exclude coverage are read liberally in favor of the insured, *First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 804 (7th Cir. 2002), and coverage should only be denied if it is "'clear and free from doubt' that the policy's exclusion prevents coverage."

8

*American Family Mutual Insurance Co. v. Fisher Development Inc.*, 391 Ill.App.3d 521, 525 (1st Dist. 2009).

The parties agree that the tanks were covered property and that their destruction and sale without recompense was a "loss." [39-5] at 4; [1-1] at 136. Hartford has to "pay for direct physical 'loss' to Covered Property Caused by any of the Covered Causes of Loss," [1-1] at 136, and covered causes of loss include any "external cause that occur[ed] during the policy period," *id.*, so there is no genuine dispute that—unless an exclusion applies, and so long as an exception to that exclusion does not apply—Hartford must reimburse Aaron for the loss suffered when the tanks were scrapped and sold. *See* [39-5] at 4.

There is also no genuine dispute about most of the facts pertinent to deciding whether the exclusion applies. It applies to any dishonest or criminal acts (including conversion and theft) committed by anyone to whom Aaron entrusted covered property, including employees of the entrusted party. [1-1] at 138–39. The parties agree that Aaron entrusted the tanks to Ocean Marine Contractors, [44] ¶ 11, and that Ocean Marine Contractors was supposed to store the tanks for five years. [47] ¶ 18. Neither party argues that the dismantling and sale of the tanks was not dishonest or did not amount to conversion. *See* [36]; [39].

The dispute at the heart of this case is over the mystery of who stole the tanks. Hartford says it was Cheramie acting on behalf of Ocean Marine Contractors, [44] ¶¶ 15, 16; [36] at 17–18, and Aaron says that Hartford has failed to prove who stole the tanks but that, if anything, "there is evidence indicating that rather than [Ocean

Marine Contractors], Cheramie had the tanks dismantled and sold on behalf of a separate corporation, Ocean Marine Recycling, LLC." [39] at 10.

Much of the evidence that might help solve that mystery is inadmissible. The crew member's statement that Cheramie was the one directing the dismantlement of the tanks is hearsay. *See* [39-4] at 2. The crew member was not deposed, no affidavit was submitted on his or her behalf, and there is no admissible evidence containing a version of the statement that would not be hearsay. *See* Fed. R. Evid. 802. Although Hartford's letter acknowledging the crew member's statement was written by Hartford and is not hearsay (because it is a statement of a party-opponent, Fed. R. Evid. 802(d)(2)), the worker's statement is hearsay-within-hearsay. *See* Fed. R. Evid. 805. Neither party has advanced any other exception to the hearsay rule that would allow the statement to be considered. That statement is excluded. For the same reasons, and because neither party has advanced any other argument to the contrary, the statements attributed to Cheramie in that letter are excluded as hearsay, too.

Garza's emailed statement that Cheramie was COO of Ocean Marine Contractors and involved in the original dealing, *see* [36-3] at 1, is also hearsay. The statement was made outside of court, by a non-party witness that was not deposed (and did not otherwise submit an affidavit) and is being introduced to prove that Cheramie was in fact in a position of authority at Ocean Marine Contractors. Fed. R. Evid. 802. Both Cohen and Reich were deposed and could ostensibly testify that they received the email, but Garza was not deposed and no other admissible evidence was introduced that might allow a trier of fact to corroborate the statement made in his

email. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial, except that affidavits and depositions, which … are not generally admissible at trial, are admissible in summary judgment proceedings to establish the truth of what is attested or deposed, provided, of course, that the affiant's or deponent's testimony would be admissible if he were testifying live") (cleaned up). Such emails might be properly considered if a showing had been made that the emails would be replaced by proper evidence (e.g., Garza's testimony) at trial, but no such showing was made and it is not at all obvious that either party would be able to establish the content of that email through other admissible evidence at trial. *Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003) (a report "introduced into the record without any supporting affidavit verifying its authenticity" was inadmissible and could not be considered for purposes of summary judgment). That email is excluded. *See* [36-3]; *Eisenstadt,* 113 F.3d at 742.

That being said, Cheramie's own admission that he was an authorized representative of Ocean Marine Contractors, made under penalty of perjury in a sworn declaration in the Louisiana action, is admissible. [39-7] ¶ 2. It is a fact to which he could competently testify, *see* Fed. R. Civ. P. 56(c)(1)(A); *Eisenstadt,* 113 F.3d at 742, and even though Cheramie was not deposed in this action, his statement has been entered into the record in an admissible form. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014).

The insurance documents that show Ocean Marine Contractors, Ocean Marine Recycling, and others were all insured under the same policy ([47] ¶ 15; [36-4]) are also admissible. True, they were introduced without any supporting affidavit verifying their authenticity, and neither party has pointed to any affidavit or declaration in the record that suggests that evidence can presently be authenticated. But where it is obvious that a document could be replaced by proper evidence at trial, *see Eisenstadt,* 113 F.3d at 742, that evidence can be considered. Presumably, Hartford would be able to produce a witness at trial that could authenticate those documents and, likely, establish that they fall within the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6). Unlike statements from an unnamed worker, Garza, and Cheramie, these documents are admissible because it is obvious they could be authenticated and verified at trial.

The assertions Aaron made in its pleadings in the Louisiana action, *see* [36] at 11–12 (citing Second Amended Complaint, *Reich Bros. LLC et al. v. Cheramie et al.*, No. 2:18-cv-3163-MLCF-JCW (E.D. La. Mar. 14, 2019), ECF No. 74), were not verified by anyone with personal knowledge of the facts contained therein, and would not be admissible as evidence at trial (or summary judgment) even if they had been made in the pleadings in this case. *See* [36-7] at 25; *Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991). *See also RBS Citizens, N.A. v. Sanyou Imp., Inc.*, 525 Fed. App'x 495, 499 (7th Cir. 2013) ("Appellants cannot avoid summary judgment by relying on mere allegations in unverified pleadings") (citing *Price*, 947 F.2d at 832).

12

Nor does judicial estoppel apply to those pleadings. There has been no showing that a determination has been reached in the Louisiana action and, at least until Aaron has prevailed there, Aaron cannot be held to allegations it has made in that action. *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) (the party to be estopped must "have convinced the court to accept its position in the earlier litigation"); *Eagle Foundation v. Dole*, 813 F.2d 798, 810 (7th Cir. 1987); *New Hampshire v. Maine*, 532 U.S. 742, 749–55 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).

Some of the assertions Aaron made in those pleadings, however, are binding judicial admissions applicable in this proceeding. Judicial admissions include "formal concessions in the pleadings," *Keller v. United States*, 58 F.3d 1194, 1199 (7th Cir. 1995), and are admissible as evidentiary admissions even if the pleading in question comes from a different proceeding, *Hardy v. Johns-Manville Sales Corp.,* 851 F.2d 742, 745 (5th Cir. 1988), so long as the admission was not advanced as part of "alternative or hypothetical pleading[s]." *Douglas Equip., Inc. v. Mack Trucks, Inc.*, 471 F.2d 222, 224 (7th Cir. 1972).

For the most part, Hartford uses the pleadings in the Louisiana action to show that Aaron entrusted the tanks to Ocean Marine Contractors. *See, e.g.*, [36] at 11–12. Those pleadings are unnecessary on that point, however, because Aaron admits that the tanks were so entrusted. [44] ¶ 11.

Aaron's admissions in the underlying Louisiana action that the tanks were "dismantled and cut up for scrap at the express direction of Cheramie," [36-7] ¶ 35, that Cheramie and others "did knowingly and intentionally misappropriate/or [sic],

13

alternatively, negligently damaged" the tanks, *id.* ¶ 41, that "[m]oney from the tanks was received by OM Recycling and Ryan Cheramie," *id.*, and that Cheramie controls both Ocean Marine Recycling and Ocean Marine Contractors, *id.* ¶ 58, are judicial admissions properly considered here. But even if those admissions were not considered, Cheramie's affidavit in the Louisiana action (in which he says that he sold the tanks on behalf of Ocean Marine Recycling and temporarily placed some of the money into his personal bank account), [39-7] at 12–14, would be enough to satisfy Hartford's burden, especially in light of the absence of any evidence that the conversion was committed by someone other than Cheramie and Aaron's admission that "there is evidence indicating that … Cheramie had the tanks dismantled and sold." [39] at 11. Cheramie and Ocean Marine Contractors caused the conversion of the tanks.

There is no genuine dispute that the dishonest or criminal act was committed by someone to whom Aaron entrusted covered property. The exclusion at issue applies to dishonest acts committed by anyone to whom covered property is entrusted, "including their employees." [1-1] at 138–39. Clauses like this one have been interpreted to include actions taken by people associated with the entity to which property was entrusted. For instance, when a company president steals computer equipment that was being leased to his company, a policy exclusion for dishonest acts committed by anyone to whom property had been entrusted applies despite the fact that the president was not himself or herself the entity that had signed the leasing agreement. *Vision Financial Group, Inc. v. Midwest Family Mutual Ins. Co.*, 355 F.3d

640, 643 (7th Cir. 2004). *See also 2900 Rock Quarry, LLC v. Westfield Ins. Co.,* No. 5:16-CV-100-BO, 2017 WL 2616961, at \*6 (E.D.N.C. June 15, 2017) ("plaintiff has cited no cases in which a court has held that an entrustment exclusion does not apply when property is entrusted to an entity but stolen by individuals associated with that entity. Rather, the cases suggest the opposite: that entrustment exclusions do apply in such situations.")

No meaningful distinction can be drawn between Ocean Marine Contractors and Ryan Cheramie. Cheramie was a representative of Ocean Marine Contractors (and the sole member of Ocean Marine Recycling). [39-7] at 13–14. An entity like Ocean Marine Contractors can only carry out acts through its officers and employees, and it would be unreasonable to interpret the term "anyone … including" to not include someone who (at least according to the evidence submitted) worked for and represented the entity to which the property was entrusted.

And since the exclusion includes any loss "caused directly or indirectly by or resulting from" any dishonest act, "regardless of any other cause or event that contributes concurrently or in any sequence to the 'loss,'" [1-1] at 138, the exclusion is phrased broadly enough to include losses caused by Ocean Marine Contractors's (i.e., Cheramie's) failure to protect the covered property. Hartford has carried its burden of showing that the exclusion applies.

In order for the exception to the exclusion to apply, Aaron must show that an act of conversion (or theft) was committed by a "rental or sales customer[s] or carrier(s) for hire." [1-1] at 139. The policy does not define the terms "carrier for hire"

15

or "rental or sales customer," and "[i]n determining the plain, ordinary, and popularly understood meaning of a term, it is entirely appropriate to look to the dictionary for a definition." *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 26 (citing Webster's Third New International Dictionary (2002)); *Palm v. Holocker*, 2018 IL 123152, ¶ 30 *reh'g denied* (Feb. 28, 2019) (citing, among others, Black's Law Dictionary (9th ed. 2009)). A "carrier" is "[a]n individual or organization (such as a shipowner, a railroad, or an airline) that contracts to transport passengers or goods for a fee." *Carrier,* Black's Law Dictionary (10th ed. 2014). JNG, not Ocean Marine Contractors, contracted to transport the goods. [36-6]. Neither side has cited evidence in the record establishing that Ocean Marine Contractors transported (or contracted to transport) the barges or tanks. It was not a carrier for hire.

A "customer" is a "buyer or purchaser of goods or services; esp., the frequent or occasional patron of a business establishment." *Customer*, Black's Law Dictionary (10th ed. 2014). *See also Customer*, Oxford English Dictionary Online, available at https://www.oed.com ("A purchaser of goods or services. In early use: *spec.* a person who regularly purchases from a particular business"); *Citigroup Global Markets v. Abbar,* 761 F.3d 268, 275 (2d Cir. 2014) (the ordinary meaning of "customer" is "someone who buys goods or services").

A sale is "[t]he action or an act of selling or making over to another for a price; the exchange of a commodity for money or other valuable consideration." *Sale,* Oxford English Dictionary Online, available at https://www.oed.com. *See also Sale,* Black's Law Dictionary (10th ed. 2014) ("[t]he transfer of property or title for a price"); *Price*,

16

Black's Law Dictionary (10th ed. 2014) ("[t]he amount of money or *other consideration* asked for or given in exchange for something else; the cost at which something is bought or sold") (emphasis added). *See also Am. States Ins. Co. v. Hartford Cas. Ins. Co.*, 950 F.Supp. 885, 887 (C.D. Ill. 1997) (someone that test-drives a car is a customer).

Even though customers are often repeat patrons, and even if the word customer implies that the patron has visited in the past or will continue to visit in the future, one-time patrons are not excluded from the definition of "rental or sales customers" as that term is used in the policy at issue.[4] Nor does the word "sales" exclude arrangements between parties that involve the transfer of services in return for goods. Dictionaries that were commonly available at the time the policy was entered into confirm that the phrase "rental or sales customers" encompasses one-time patrons that provide a service instead of money in return for goods. Hartford's attempt to limit the term "sales customer" to mean "one who regularly uses money to pay for goods from the same seller" is unconvincing because the plain meaning of the words "rental or sales customer" is much broader and includes transactions like that at issue here.

Bailments involve "an agreement by the bailor to transfer or deliver and the bailee to accept exclusive possession of goods for a specified purpose, the actual

---

[4] Hartford's brief contains a few paragraphs with factual assertions that lack corresponding citation to the record. [36] at 23–24. Each of those factual assertions is disregarded. *Niebur v. Town of Cicero*, 212 F.Supp.2d 790, 800 (N.D. Ill. 2002) (an argument made without any citation to the record is waived); *Groza v. I.N.S.*, 30 F.3d 814, 821 n.6 (7th Cir. 1994). In any event, none of those factual statements (even if true) would change the result: Ocean Marine Contractors was Aaron's "rental or sales customer" as that term was used in the policy.

delivery or transfer of exclusive possession of the property of the bailor to the bailee, and acceptance of exclusive possession by the bailee." *Kirby v. Chi. City Bank & Tr. Co.*, 82 Ill.App.3d 1113, 1116 (1st Dist. 1980). *See also Bishop v. Allied Van Lines, Inc.*, 80 Ill.App.3d 306, 308 (3rd Dist. 1980) (a bailment is "merely the delivery of goods for some purpose upon a contract, express or implied, and after the purpose has been fulfilled the goods are to be redelivered to the bailor"). Ocean Marine Contractors and Cheramie may have been bailees of the tanks, but they also received payment in the form of barges and that payment made them not only bailees but also "rental or sales customers" of Aaron's. Illinois law recognizes that one who takes temporary possession of a good can be both a bailee and a customer, *Chabraja v. Avis Rent A Car Sys., Inc.*, 192 Ill.App.3d 1074, 1077 (1st Dist. 1989) ("[r]enting a car creates a bailment between the leasing company (bailor) and the customer (bailee)"), and there is nothing about the plain meaning of the term "rental or sales customer" that excludes from its reach bailees that obtain barges in return for providing storage services. It may have been an unusual arrangement for Aaron but it was not one that brought Ocean Marine Contractors outside of the definition of the term as it was used in Hartford's policy.

At least for purposes of interpreting the policy, it is irrelevant what one of Hartford's adjustors believed the term "sales customer" meant because what matters during the interpretation of a written agreement is whether the interpretation Hartford advances is an objectively reasonable one. *See* [39-10] at 87:12–88:17; *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462 (1999). Hartford also explains

18

the context of Ocean Marine Contractors's offer (other people provided offers, Aaron took the only offer that did not require exchanging money, and Cohen believed that Ocean Marine Contractors was going to take the barges and sell them for money, *see* [43] at 4–5) but fails to explain why that context matters. Again, what matters is what was written in the agreement in question. *See Air Safety, Inc.*, 185 Ill.2d 457, 462 (1999). To the degree there is any factual dispute as to the basic elements of the transaction that took place between Reich, Aaron, JNG, and Ocean Marine Contractors (none was raised in any of the parties' briefing), those details don't change Ocean Marine Contractors's status as Aaron's sales customer.

Hartford is right that Aaron has the burden of proving that the exception to the exclusion applies. But Aaron has carried that burden. The only reasonable interpretation of the policy is that Ocean Marine Contractors was Aaron's sales customer—Aaron sold it barges—and, even drawing all inferences in Hartford's favor, Ocean Marine Contractors (or Cheramie acting on its behalf) committed conversion or theft when it acquiesced in the sale of the tanks to a scrap metal dealer. *See Roderick Dev. Inv. Co. v. Cmty. Bank of Edgewater*, 282 Ill.App.3d 1052, 1057 (1st Dist. 1996) ("[t]o sufficiently allege conversion, therefore, a plaintiff must allege (1) the defendant's unauthorized and wrongful assumption of control, dominion or ownership over the plaintiff's personal property, (2) the plaintiff's right in the property, (3) the plaintiff's right to immediate possession of the property, absolutely and unconditionally and (4) the plaintiff's demand for possession of the property"). Hartford's motion for summary judgment as to its claim for declaratory judgment,

[35] at 1, is denied, and Aaron's motion for summary judgment with regard to Hartford's claims, [38] at 2, is granted. Aaron's motion for partial summary judgment on Aaron's counterclaim "on the issue of liability" is granted insofar as that motion seeks a declaratory judgment that Aaron's claim regarding the lost stainless steel tanks is covered under the insurance policy that Hartford issued to Aaron in June of 2018. *See* [38] at 2; [1-1].

Section 155 damages are appropriate if an insurer's actions with respect to a claim made under a policy are "vexatious and unreasonable." 215 Ill. Comp. Stat. Ann. 5/155; *Cramer v. Ins. Exch. Agency*, 174 Ill.2d 513, 518 (1996). If a "bona fide dispute concerning coverage exists, costs and sanctions are inappropriate." *State Farm Mut. Auto. Ins. Co. v. Smith*, 197 Ill.2d 369, 380 (2001). Bona fide disputes are those that, under the totality of the circumstances, are "real, actual, genuine, and not feigned." *Am. States Ins. Co. v. CFM Constr. Co.*, 398 Ill.App.3d 994, 1003 (2nd Dist. 2010) (cleaned up). "An insurance company does not violate section 155 merely by unsuccessfully litigating a dispute." *Ulrich Children's Advantage Network v. Nat'l Union Fire Co.*, 398 Ill.App.3d 710, 723 (1st Dist. 2010).

At the time Hartford denied coverage, Hartford took the position that coverage was not warranted. It reasoned that the thief was someone to whom Aaron had entrusted the property, and that "which entity committed the act or profited from the act is immaterial as the dishonest and criminal act itself was done at the direction of Ryan Cheramie." [39-4] at 2–3. In its denial letter, it also advanced its argument that "the relationship between Aaron and the Cheramie entities was that 'of a bailee, not

a sales customer.'" [39-4] at 3. One of Hartford's representatives said that Hartford denied Aaron's insurance claim without determining who sold the tanks, *see, e.g.* [39-10] at 126:14–128:4, and that Aaron and Reich had sold the barges to Ocean Marine Contractors. *Id.* at 117:17–118:24 ("Q. … Would you agree that as far as Hartford was able to determine Aaron and Reich sold barges to OMC and transferred tanks as well? THE WITNESS: That is correct.")

Hartford's interpretation of the policy language was incorrect but not unreasonable or vexatious. Ocean Marine Contractors was different from the typical "sales customer" in a few notable (but ultimately unimportant) ways and it was reasonable to argue that Ocean Marine Contractors's failure to pay using money combined with its failure to engage in repeat transactions with Aaron took this occurrence outside of the exception to the exclusion. Aaron has also not pointed to any evidence from which a reasonable juror could conclude that Hartford's decision was vexatious. After Aaron raised the exception to the exclusion, Hartford conducted a limited investigation to confirm that, under its reading of the exclusion and the exception, it did not matter whether it was Ocean Marine Contractors or someone acting on behalf of Ocean Marine Contractors that stole or converted the tanks. *See* [39-10] at 102:17–103:4. Aaron has pointed to evidence that suggests one of the adjustors was limited in his review of Aaron's claim, but that was because the previous adjustor was out on medical leave, *see* [45-1] 64:1–14, and nothing in the cited testimony suggests the second adjustor's failure to investigate further was vexatious (even if it was "unusual") given that Hartford's (reasonable) position at the

time was that it did not matter who stole or converted the tanks. *See* [45-1] at 64:1–69:16. Nor can any vexatious intent be inferred from the fact that the replacement adjustor was relying on findings made by the previous adjustor and someone else that had worked with that previous adjustor. *See id.* at 46:12–69:16. At most, the cited testimony supports an inference that Hartford was not as careful as it could have been. Under the totality of the circumstances, that is not enough to support a reasonable inference that Hartford's attitude or litigation strategy were vexatious.

"[A]n insurer's conduct is not vexatious and unreasonable if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000) (cleaned up). Neither side cited any prior decision that squarely addressed whether a "rental or sales customer" includes someone like Ocean Marine Contractors and the argument Hartford advanced (though unsuccessful) evidenced a disagreement that was "real, actual, genuine, and not feigned." *Am. States Ins. Co.*, 398 Ill.App.3d at 1003 (2nd Dist. 2010) (cleaned up). Aaron cited no evidence from which a reasonable juror could conclude otherwise. Hartford's motion for summary judgment on Aaron's bad faith claim under § 155, [35], is granted.

## IV.    Conclusion

Hartford's motion for summary judgment, [35], is granted in part, denied in part. Aaron's motion for summary judgment, [38], is granted insofar as that motion seeks a declaratory judgment that Aaron's claim regarding the lost stainless steel tanks is covered under the insurance policy that Hartford issued to Aaron in June of 2018. [1-1]. A status hearing is set for January 30, 2020, at 9:30 a.m.

ENTER:

Manish S. Shah
United States District Judge

Date:  January 8, 2020